IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                                :
UNITED STATES OF AMERICA,       :
                                :
        v.                      :    Criminal No. 06-151 (JBS)
                                :
MATTHEW FOX,                    :
                                :    OPINION
              Defendant.        :
                                :
_____:
```

**APPEARANCES:**

Andrew J. Kameros, Trial Attorney
Michael Phillip Ben'ary, Trial Attorney
UNITED STATES DEPARTMENT OF JUSTICE
601 D. Street N.W.
Room 7130
Washington, DC 20530
        Attorneys for the United States

Louis M. Barbone, Esq.
JACOBS & BARBONE, P.A.
1125 Pacific Avenue
Atlantic City, NJ 08401
        Attorney for Defendant Matthew Fox

**Simandle, District Judge:**

**I.   INTRODUCTION**

        This matter is before the Court on the motion of Defendant

Matthew Fox for acquittal notwithstanding a jury verdict,

pursuant to Fed. R. Crim. P. 29(c), and, alternatively, for a new

trial on Counts Two through Six of the indictment against him,

pursuant to Fed. R. Crim. P. 33(a).  The motion is opposed.  The

Court received written submissions from the parties, held

argument on the motions, and received supplemental submissions

after the argument.  The Court has considered all of the

submissions and arguments of the Defendant and the United States. For the reasons explained, the Court shall deny the motion for acquittal and a new trial.

## II.  BACKGROUND

On March 1, 2006, a federal grand jury returned an indictment charging Matthew Fox and Melody Willis Fox with one count of

conspiracy to defraud the United States in violation of 18 U.S.C. § 371, and Matthew Fox with five counts of attempted evasion of income taxes for the years 1998 through 2002 in violation of 26 U.S.C. § 7201.  Specifically, the Indictment alleged that the correct tax due and owing was substantially understated, as follows:

| Count | Year | Taxable Income Reported | Tax Reported | Actual Taxable Income | Actual Tax |
|-------|------|------------------------|--------------|----------------------|------------|
| 2 | 1998 | 0 | 0 | $29,688 | $5,014 |
| 3 | 1999 | $2,550 | $384 | $24,810 | $3,724 |
| 4 | 2000 | $10,248 | $1,519 | $112,580 | $29,581 |
| 5 | 2001 | $21,843 | $3,706 | $154,007 | $41,870 |
| 6 | 2002 | $46,744 | $11,150 | $170,662 | $49,173 |

On July 30, 2007, following a three week trial before this Court, the jury convicted Matthew Fox of attempting to evade his individual income taxes for the years 1998 through 2002 (Counts Two through Six of the Indictment) and acquitted Matthew Fox and

Melody Fox of conspiring to defraud the United States (Count One of the Indictment).

The Government adduced evidence at trial that Matthew Fox failed to report substantial income for each of the tax years 1998 through 2002.  The Government utilized the net worth and expenditures method of proof in computing Fox's actual income for each of those years.  The Government presented evidence of Fox's personal expenditures (including payments from his checking account, and purchases made with cash and/or money orders), and increases/decreases in his net worth, to establish by inference that his substantial increase in net worth came from unreported taxable income.

More specifically, the evidence showed that Mr. Fox began working at an Atlantic City gentleman's club called Bare Exposure as a doorman in 1997.  (Tr. July 17 at 158.)  Fox confirmed, in loan applications in 2001, that he had been employed at Bare Exposure for six years, establishing that he had certainly worked there since at least 1997 and perhaps as early as 1995.  (Gov. Ex. 24.2 & 38.1.)  The Bare Exposure manager, Anthony Ariemma, testified that Fox was promoted to manager in early 1998, when the prior manager was fired.  (Tr. July 17 at 162.)  Ariemma testified that he paid Fox $100 per shift and that Fox worked three and sometimes four shifts per week.  (Id. at 162-163.)  In addition, by the beginning of 1999, Fox began receiving a share

of the tips for each shift, typically an additional $100-120 in tips on a Saturday shift, or $60-70 in tips on a Friday shift, or as little as $20-30 in tips on a weekday shift. (Id. at 163-165) He continued to work at Bare Exposure as a manager until 2004.

Fox filed tax returns for 1998-2002, the years at issue. He declared taxable income from Bare Exposure of $0 in 1998 (a year in which he stated he received only wages from a casino in the amount of $3,173, which is not at issue). He declared only $9,600 in wages from Bare Exposure for 1999 (declaring nothing for tips), $20,800 in wages from Bare Exposure for 2000 (again declaring nothing for tips), $14,400 in wages and $10,325 in tips from Bare Exposure for 2001, and finally, $16,800 in wages and $28,600 in tips from Bare Exposure for 2002, which return was not filed until April 2004.

According to evidence at trial, the IRS analysis of Fox's expenditures over these years revealed much higher levels of expenditures than explainable by the expenditure of the current years' declared income and any non-taxable income or assets. IRS Revenue Agent Ken Kelly testified to his opinion, based on the available evidence, that Fox's actual taxable income for the years in question was as follows: $29,688 in 1998, $24,244 in 1999, $112,529 in 2000, $149,406 in 2001, and $167,845 in 2002. (Gov. Ex. 43.1(a)). Agent Kelly testified that Fox therefore owed additional income taxes for the years 1998, 1999, 2000,

4

2001, and 2002 in the amounts of $5,257, $3,294, $28,046, $36,831, and $37,037, respectively.  (Tr. July 19 at 162-164.)

As discussed in detail below, Defendant Fox took the position that his spending came from non-taxable sources, namely, a pre-existing "cash hoard" (derived from several sources including Social Security benefits as a minor, insurance payments, and cash from family sources) and beginning in August 2000 from the earnings of his then-girlfriend Melody Willis, a dancer at his gentleman's club who moved to New Jersey from Florida in July 2000, and whom he married in 2003.  For the years 2000, 2001, and 2002, according to his defense, Melody's earnings exceeded $100,000 per year and were used by Matthew Fox to fund the high expenditures of those last three years at issue in this case.

The expenditures uncovered by the IRS are not disputed in this motion, but the sources of those expenditures were hotly contested at trial -- whether Matthew Fox had a cash hoard as of January 1998 (the beginning of the tax period) and whether Melody Fox was actually employed and earning the income to explain the expenditures Matthew Fox made in 2000-2002.  To be sure, the jury heard evidence on both sides of these issues and was called upon to make determinations of credibility and weight of the competing evidence.

5

At trial, former retired IRS Special Agent Paula Lipski ("Agent Lipski") testified about the steps she took to investigate the alleged tax evasion in this case.  She testified that after informing Mr. Fox's attorney in April of 2003 that Mr. Fox was under investigation for failing to report income for 1998-2002, she met with Fox's attorney, Louis Barbone, Esq., in July of 2003. (Tr. July 12 at 81-82.)  At an August 14, 2003 meeting with Mr. Barbone, Agent Lipski received copies of Melody Willis tax returns for the years 2000, 2001, and 2002, which had been signed on July 29, 2003.  (Id. at 83.)  In Agent Lipski's words, those returns showed "substantial income that was consistent with the amount of income I stated was not reported on Mr. Fox's tax return."  (Id. at 84.)  As she explained, if those returns were true, they would have been a legitimate source of funds explaining Mr. Fox's expenditures for the latter half of 2000 and for the years 2001 and 2002 at issue.

Accordingly, Agent Lipski tried to determine whether there was any truth to the belated Melody Willis Fox returns.  Agent Lipski examined sworn testimony by Melody Fox in a Florida child custody dispute with her ex-husband indicating that she hadn't worked since August of 2000 and that Matthew Fox was supporting her.  (Id.)  She also reviewed Melody Willis' affidavit submitted in the Florida case in which she claimed she was "unemployed." Agent Lipski also consulted IRS databases to determine whether

any tax documents were available to indicate Melody Fox's employment or independent contractor status, including W-2 and 1099 forms, and there were none.  (Id. at 84-85.)  Agent Lipski also interviewed the person who prepared the Melody Willis tax returns, namely Maureen Dougherty, and tried to determine where Melody Fox was claiming to have worked because the forms apparently indicated only that she worked at "various locations." (Id. at 85.)  When Agent Lipski asked the tax preparer where those "various locations" are, she received no reply.  (Id.)  She testified, "when I asked for records specifically just telling me the name of the employer,... no one came up with the name of an employer."  (Id. at 94.)  As a result of this investigation, the IRS determined that the Melody Willis Fox tax returns were not truthful, that is, that Melody Fox was reporting hundreds of thousands of dollars of income for 2000, 2001, and 2002 that had not in fact been earned, after learning of the IRS investigation, apparently in the effort to conceal Matthew Fox's alleged unreported income, and Melody Fox also became a target of the IRS investigation.

     The government also introduced evidence of Matthew Fox's net worth as of the beginning of 1998, the first tax year in question, and for the beginning and end of each subsequent tax year through 2002.  In the course of her investigation of Matthew Fox, Agent Lipski testified, she determined that on January 1,

7

1998 Matthew Fox had $500 cash on hand and $1,000 in his bank account.  (Tr. July 12 at 86:18-23.)  She based her determination in part on a loan application Matthew made on April 7, 1998, in which he stated that he had $500 cash on hand, $1,000 in the bank.  Further, the application was to finance a motor boat at 13.5% interest, which, Agent Lipski noted, was inconsistent with having significant cash available.  (Id. at 87.)  However, on cross examination, Agent Lipski also testified that she learned during her investigation that Mr. Fox made a loan to his employer, in December of 1998, of $6,000.  (Tr. July 17 at 38:15-17.)  Mr. Ariemma, the employer, corroborated that Mr. Fox made such a loan in December 1998.  (July 17 Tr. at 173.)

Agent Lipski also obtained credit card records indicating that Matthew Fox had a balance on his credit card in early 1998, and thereby incurring credit card fees, which was also inconsistent with having access to cash.  (Tr. July 12 at 88.) In addition, Agent Lipski testified that Mr. Fox borrowed money from his sister, Jennifer, with whom he was living, to buy a car because, she said, he didn't have any money.  (Id. at 133:7-8.) Matthew's sister Jennifer also told Agent Lipski that he did not keep cash in the safe (sometimes also called the gun-safe) in the house, as Matthew Fox later claimed.

According to Agent Lipski, in her August 2003 meeting with Matthew Fox's attorney, Louis Barbone, she was told that Mr. Fox

8

received payments, totaling approximately $54,053 from 1987 to 1994, from an insurance settlement as a result of his mother's death (<u>id.</u> at 89), including a lump sum of $34,053 in 1994 (<u>id.</u> at 118).  Agent Lipski noted that none of that money appeared in Defendant's bank accounts at the beginning of 1998.  (<u>Id.</u>)  Agent Lipski determined that the insurance payments received from 1987 to 1994 were not relevant to the years under investigation in this case or Defendant's opening net worth because the money did not appear to be available to him at the beginning of 1998. (<u>Id.</u>)

Mr. Barbone also told Agent Lipski that Matthew Fox received Social Security payments, of about $40,000, as a result of his mother's death twenty years earlier in 1981.  Agent Lipski determined that those funds were also unavailable to Defendant as of January 1, 1998 because she believed the money would have been long since spent many years before 1998, since Social Security payments would have ended at age 21 in 1990.  (<u>Id.</u> at 90-91.)

Defendant's attorney also told Agent Lipksi that Matthew Fox received cash from his parents' business over the years that was available to him in January 1998.  (<u>Id.</u> at 91.)  Defendant's attorney indicated that Fox had received and saved approximately $34,000 as a child from his parents' business.  (<u>Id.</u>)  No other information was given to Agent Lipski about when this money was received, what the nature of Defendant's parents' business had

9

been, or where it was located.  Agent Lipski did not attempt to interview Defendant's parents because his mother had passed away in the 1981 accident and his father was not mentally competent in 2003.  (Id. at 92.)

At the August 2003 meeting, Agent Lipski was also told by attorney Barbone that Mr. Fox's father and grandmother had held money for him and gave it to him in 1996 or 1997.  (Id. at 148-49.)  No proof of this assertion was furnished to her, nor was the amount of this money, if any, revealed to her.

Mr. Barbone, as Defendant's attorney, also showed Agent Lipski $20,000 in cash in 2003, claiming that this was part of Matthew Fox's cash hoard.  Agent Lipski indicated that the availability of that cash at a meeting in August 2003 did not indicate, to her, that it had been available in January of 1998, but rather, that it likely had been earned from 1998-2002; alternatively, the existence of the $20,000 cash in 2003 was irrelevant to the expenditures she found he made in 1998-2002, because it would not explain the money he had spent during those five years.

Agent Lipski also testified that in her endeavor to determine whether Defendant had a cash hoard, she learned that Mr. Fox had a safe in his home.  (Id. at 116.)  She investigated the safe.  Thereafter, she spoke with Mr. Fox's sister, Jennifer, who lived with Mr. Fox at the time and told Agent Lipski that no

10

money was being stored in the safe.  (<u>Id.</u> at 116-17.)   Agent
Lipski also testified that Mr. Fox's bills for these years were
not "being paid off timely."  (<u>Id.</u> at 117:11-12.)

Based on all this evidence and evidence of cash withdrawals
from Defendant's bank account during the early part of 1998, as
well as the absence of other bank or investment accounts
containing the money, Agent Lipski determined that he had no cash
hoard, from any of these sources, in January 1998.  His financial
behavior, such as financing relatively small purchases and paying
interest, taking cash advances from his credit card with interest
and transaction fees, borrowing from his own sister because he
had no money, lack of cash secured in his home's safe, and the
absence of money in his bank account from the previous insurance
payments and Social Security benefits that had been paid by
check, led Agent Lipski to rule out the existence, as of January
1998, of a cash hoard from which his expenditures could be
explained for the 1998-2002 period.

Agent Lipski further determined that Melody Fox's tax
returns were not accurate because of her testimony and Matthew
Fox's testimony in the Florida custody case, the lack of
documentation of her employment, and her inability to provide the
name of her employer.  (Tr. July 12 at 94:13-18.)  Agent Lipski
received from the preparer of the returns, Maureen Dougherty, "a
schedule that reflected her methodology in computing the income

that was reported" as Melody's.  (Id. at 94:19-22.)  That
schedule indicated that Melody Fox was claiming certain deposits
into Matthew Fox's bank accounts represented income she had
earned and deposited in his account.  Agent Lipski testified that
her investigation revealed Matthew and Melody did not meet until
July 2000, but that the schedule indicated in February of 2000,
$4,500 deposited into Matthew's account was Melody's income,
which had to be impossible because the couple did not even know
each other before July 2000.  (Id. at 95-96.)  Similar large
deposits to Matthew's account were credited to Melody that could
not have been her earnings, for example in March ($6,000), April
($6,600), and May ($8,720), all before Melody and Matthew met in
July 2000, leading Agent Lipski to conclude the new Melody Fox
tax returns were not factually correct.  (Id. at 96.)  At the
very least, those large deposits from February through May 2000,
totaling $25,820, could not have come from Melody's earnings.

    Agent Lipski also testified about what she did to verify
whether or not Matthew Fox was working for the charged years.  On
July 11, 2003 she interviewed Anthony Ariemma, an owner of Bare
Exposure, a club where Agent Lipski believed Matthew Fox had been
employed.  (Tr. July 12 at 159.)  Ariemma confirmed that Matthew
Fox worked at Bare Exposure and described his income and tips, as
noted above.  Lipski also obtained W-2 status from Bare Exposure
for Matthew Fox from the IRS database beginning with 1999, there

being none for 1998, a year in which Fox claimed no income from Bare Exposure despite working there as a manager and receiving tips.

The jury also heard the testimony of Matthew Fox and Melody Willis Fox.  Contrary to his many written and testimonial statements, Matthew Fox testified at trial that he started working at Bare Exposure in 1999 (Tr. July 24 at 124); he was confronted on cross-examination, by his own testimony in the Florida custody hearing, that he was the manager at Bare Exposure since March 1995, as reflected in the Florida transcript at Ex. 7.1(a), p.77.  (Id. at 190.)  Likewise, he admitted his March 2001 credit application (Ex. 38.1) stated he had worked at Bare Exposure (identified as "PRBA") for six years, i.e., since 1995, earning $4,500/month salary.  (Id. at 191-192.)  His Kensington Furniture credit application in April 2001 (Ex. 24.2) likewise acknowledged six years of continuous employment, at $70,000 per year, at Bare Exposure ("PRBA"), see id. at 193.  He likewise admitted he stated on his Ford Credit application (Ex. 11.1) in June 1999 that he has been a manager at Bare Exposure for four years earning $36,000/year.  (Id. at 195-196.)

At trial, Matthew Fox claimed he had received $137,000 in cash from his father in a Shop-Rite grocery bag full of money on March 17, 1997, that he believed was money his father had held for him, (Tr. July 24 at 148), of which he surmised $55,000 came

from the settlement of his mother's death case and other money may have come from the Social Security checks his father had received years before in his behalf when he was a minor, although he didn't know what his father did with those checks. (Id. at 149.)

He claimed at trial to have stashed this money into a gun safe which also held shotguns for hunting. (Id. at 155.) He explained that he borrowed small amounts of money rather than use this cash in order to build up credit. He also described how he met Melody Willis in the end of June 2000 and claimed she continued as a dancer earning $500 to $1,000 on weeknights, $1,000 to $2,000 on Fridays, and $1,200 to $3,300 on Saturdays. (Id. at 170.) He explained how, after he came under IRS investigation, he went to Maureen Dougherty for tax assistance for preparation of Melody Fox's tax returns in 2003, resulting in the 2000, 2001, and 2002 Melody Willis Fox returns that were eventually filed.

Again, on cross-examination about his claimed receipt of a large bag of cash from his father, Matthew Fox claimed he kept that sum in his home and that he was unaware of federally-insured banks, or of the fact that banks would pay him interest upon his bank deposits, (Tr. July 24 at 209-211.) which the jury could well have found incredible, undermining whatever else he offered about this secret cash resource.

14

He claimed he lied to the Florida court to help Melody win her child custody case, although he later admitted he was concerned Melody's ex-husband could discover she was still employed as a dancer at Bare Exposure.  (Tr. July 24 at 175; Tr. July 25 at 16-18, 20-21.)  Again, the jury would have found that his testimony in this trial was unbelievable and contradicted by his Florida testimony that she had quit dancing, since it would not have been difficult for a private investigator to learn the truth if Melody was dancing.

Melody Fox's testimony described her earlier marriage to Michael Willis, with whom she had a daughter born in 1998, how she had worked as a dancer and model in Florida, and how their marriage failed.  She testified about moving to New Jersey and working at Bare Exposure after August 2000.  She also acknowledged her child custody deposition, hearing, and trial in Florida in which she testified she was not working in New Jersey and was supported by Matthew Fox.  (Tr. July 25 at 66-69).  She claimed she falsely swore to an affidavit in the custody battle that she was "unemployed" and a "stay-at-home mother."  (Id. at 68.)  She confirmed that after Matthew Fox came under IRS investigation, she met with Maureen Dougherty in June 2003, who advised her to file her tax returns if she had earned income for those years.  (Id. at 57-61.)  She also testified she had no

discussion about her tax returns with Matthew Fox.  (<u>Id.</u> at 62:16-20.)

On cross examination, Melody Fox stated she made four false statements under oath in the custody proceedings (emergency hearing, deposition, trial, and financial affidavit).  She acknowledged that if she was trying to hide her employment as a nude dancer, it may have failed since anyone, including an investigator, could come in off the street and see her if she were working.  (<u>Id.</u> at 86-87.)  She also attempted to explain how money she earned in early 2000 came to be reflected as claimed deposits in Matthew's bank account at a time before they knew one another.  (<u>Id.</u> at 95-96.)

## III. DISCUSSION

### A.  Standard

Under Rule 29(c) of the Federal Rules of Criminal Procedure,

> a court may enter a judgment of acquittal if it finds that as a matter of law the evidence is insufficient to sustain a conviction. In reviewing a motion for Judgment of Acquittal, the court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir. 2002) (quoting <u>United States v. Wolfe</u>, 245 F.3d 257, 262 (3d Cir. 2001)). Further, the court is required to draw "'all reasonable inferences in favor of the jury's verdict.'" <u>Smith</u>, 294 F.3d at 476-77 (quoting <u>United States v. Anderskow</u>, 88 F.3d 245, 251 (3d Cir. 1996)).

The defendant must also overcome the jury's special province in evaluating witness credibility and conflicting testimony. <u>United States v. Hakim</u>, 2002 U.S. Dist. LEXIS 18151, No. 02-CR-131, 2002 WL 31151174, at *6 (E.D. Pa. Sept. 24, 2002) (citing <u>United States v. McGlory</u>, 968 F.2d 309, 321 (3d Cir. 1992)). Further, the court in <u>United States v. Scarfo</u>, 711 F. Supp. 1315, 1334 (E.D. Pa. 1989) held that "a court may not grant a motion for acquittal based on conflicting testimony, that is, testimony of a questionable quality; it is up to the jury to weigh conflicting testimony, determine credibility, and ultimately draw factual inferences." Thus, "a finding of insufficiency should be confined to cases where the prosecution's failure is clear." <u>Smith</u>, 294 F.3d at 477 (quoting <u>United States v. Leon</u>, 739 F.2d 885, 891 (3d Cir. 1984)).

<u>United States v. Carmichael</u>, 269 F. Supp. 2d 588, 594-595 (D.N.J. 2003) (Simandle, J.).

[A] trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings. In deciding whether to grant the motions for acquittal, the trial court [is] required to view the evidence in the light most favorable to the prosecution and to draw all reasonable inferences therefrom in the government's favor. Viewing the evidence in this light, the trial court [is] obliged to uphold the jury's verdict unless no rational jury could conclude beyond a reasonable doubt that the defendant[] willfully attempted to evade [his] tax obligations.

<u>United States v. Ashfield</u>, 735 F.2d 101, 106 (3d Cir. 1984) (citations omitted).  More recently, in reversing a district court's granting of a judgment of acquittal, the Court of Appeals found:

17

> The evidence was not overwhelming, but all
> that was required was that "any rational
> juror could have found the elements of the
> crime beyond a reasonable doubt."

United States v. Carbo, 572 F.3d 112, 119 (3d Cir. 2009), quoting

United States v. Cartwright, 359 F.3d 281, 286 (3d Cir. 2004).

Federal Rule of Criminal Procedure 33(a) states that "upon

the defendant's motion, the court may vacate any judgment and

grant a new trial if the interest of justice so requires."  Such

a remedy is available in exceptional cases where an injustice

would occur if the court failed to act.  United States v.

Lebovitz, 586 F. Supp. 265, 267 (W.D. Pa.), aff'd, 746 F.2d 1468

(3d Cir. 1984); United States v. Phifer, 400 F. Supp. 719, 722

(E.D. Pa. 1975), aff'd, 532 F.2d 747 (3d Cir. 1976).  Rule 33

affords relief if, for example, the trial court finds

prosecutorial misconduct or when the trial court does not believe

the evidence supports the jury's verdict.  United States v.

Dixon, 658 F.2d 181, 193 (3d Cir. 1981) (reversing judgment of

acquittal but remanding for consideration whether to grant new

trial under Rule 33 on grounds of juror confusion and

insufficient limiting instructions).

> This Circuit has described a district court's
> consideration of a Fed. R. Crim. P. 33 motion
> for a new trial based on the "weight of the
> evidence" as follows: A district court can
> order a new trial on the ground that the
> jury's verdict is contrary to the weight of
> the evidence only if it "believes that 'there
> is a serious danger that a miscarriage of
> justice has occurred--that is, that an

> innocent person has been convicted.' " <u>United States v. Santos</u>, 20 F.3d 280, 285 (7th Cir. 1994) (quoting <u>United States v. Morales</u>, 902 F.2d 604, 606 (7th Cir. 1990)). Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case. <u>See</u> <u>United States v. Lacey</u>, 219 F.3d 779, 783-84 (8th Cir. 2000); <u>United States v. Ashworth</u>, 836 F.2d 260, 266 (6th Cir. 1988). <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002). Thus, "motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." <u>Government of Virgin Islands v. Derricks</u>, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

<u>United States v. Brennan</u>, 326 F.3d 176, 188-89 (3d Cir. 2003)

### B.   Net Worth & Expenditures Method for Proving Tax Evasion

In this case, the United States sought to prove that Defendant Matthew Fox evaded his taxes by showing he spent considerably more money during each year between 1998 and 2002 than he could have if he had earned only the income he declared on his tax returns for those years, taking into account his net worth at the beginning of 1998 and making reasonable efforts to exclude non-taxable sources for such expenditures.  This so-called net worth and expenditures method for proving tax evasion is an indirect method for proving that an individual has earned unreported income during a given period of time.  As the Supreme Court explained in <u>Holland</u>, the methodology depends on an accurate understanding of an individual's net worth at the

19

beginning of the period and a calculation of money spent during the period:

> In a typical net worth prosecution, the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an "opening net worth" or total net value of the taxpayer's assets at the beginning of a given year. It then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income.

Holland v. United States, 348 U.S. 121, 125 (1954).  An assumption underlying this methodology is that money expended during this period that is in excess of reported income plus opening net worth derives from a reportable but unreported source of income, "and that when this is not true the taxpayer is in a position to explain the discrepancy."  Id. at 126.

> The application of such an assumption raises serious legal problems in the administration of the criminal law. Unlike civil actions for the recovery of deficiencies, where the determinations of the Commissioner have prima facie validity, the prosecution must always prove the criminal charge beyond a reasonable doubt.

Id.   Thus, there are several required safeguards on the use of the net worth and expenditures methodology to prove criminal guilt.

The first requirement is that the Government must establish the opening net worth with reasonable certainty.   Id. at 132.

> [A]n essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset.

Id.

The second safeguard is the requirement that the Government investigate "reasonable leads" provided by the accused that would explain the spending or increase in net worth.   In other words, the Government cannot prosecute a person for tax evasion who has provided a reasonable explanation of a non-taxable source for his or her income that the Government has not investigated.

> When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer -- leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may

21

> consider them as true and the Government's case insufficient to go to the jury. This should aid in forestalling unjust prosecutions, and have the practical advantage of eliminating the dilemma, especially serious in this type of case, of the accused's being forced by the risk of an adverse verdict to come forward to substantiate leads which he had previously furnished the Government. It is a procedure entirely consistent with the position long espoused by the Government, that its duty is not to convict but to see that justice is done.

Id. at 135-36.

Third, the Government must prove either that there is a likely source of unreported income or negate all possible non-taxable sources of that income.  Thus, as the Third Circuit summarized in United States v. Goichman, 547 F.2d 778, 781 (3d Cir. 1976):

> . . . Under the net worth method, the government attempts to establish by circumstantial proof the existence of unreported income by selecting an opening year for which it can reasonably ascertain the defendant's net worth and comparing that amount with a closing year's net worth. Any estimated nondeductible living expenses during that period are added to the closing net worth. The opening net worth is subtracted from the closing net worth to gauge the amount of unreported income the defendant must have had. But the government's burden does not rest there, it must then either prove that there is a likely source of the unreported income, Holland v. United States, 348 U.S. 121, 75 S. Ct. 127, 99 L.Ed. 150 (1954), or negate all possible nontaxable sources of that income. United States v. Massei, 355 U.S. 595, 78 S. Ct. 495, 2 L.Ed.2d 517 (1958).

22

Even if the prosecution proves increases in net worth, it must also show such increases are the result of receipt of taxable income, as the Supreme Court has made clear:  "Also requisite to the use of the net worth method is evidence supporting the inference that the defendant's net worth increases are attributable to currently taxable income."  Holland, 348 U.S. at 137.

> Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient . . . . Any other rule would burden the Government with investigating the many possible nontaxable sources of income, each of which is as unlikely as it is difficult to disprove. This is not to say that the Government may disregard explanations of the defendant reasonably susceptible of being checked. But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant.

Id. at 137-38.

Thus, in the absence of relevant leads to nontaxable sources of income, the law does not require the IRS to negate every possible source of nontaxable income.  Id.

In the present case, the United States pursued its net worth and expenditures method of proof by negating all possible nontaxable sources.  It is well-established that "[s]hould all possible sources of nontaxable income be negated, there would be

no necessity for proof of a likely source." <u>United States v.</u>
<u>Massei</u>, 355 U.S. 595 (1958).  In <u>Massei</u>, the Supreme Court
reviewed an order of the First Circuit which was based in part on
the absence of "proof of likely source" of the taxpayer's net
worth increases, which the Court of Appeals had regarded as an
"indispensable" element of the net worth method of proof under
<u>Holland</u>, <u>supra</u>.  The Supreme Court stated that, although proof of
a likely source was "sufficient" to convict in a net worth case
where the Government did not negate the possible nontaxable
sources, "[t]his was not intended to imply that proof of a likely
source was necessary in every case."  <u>United States v. Massei</u>,
355 U.S. 595.  The Government sustains this burden if the
evidence shows that there was a thorough investigation of
relevant leads "which removes any reasonable doubt that the
defendant's unreported income came from nontaxable sources."
<u>United States v.Hiett</u>, 581 F.2d 1159, 1202 (5th Cir. 1978).

Whether the Government has sufficiently pursued reasonable
leads to negate nontaxable sources is a jury question, as both
parties recognize, in accordance with <u>United States v. Greene</u>,
698 F.2d 1364, 1371 (9th Cir. 1983) ("However, the government is
not the final arbiter in determining which leads are relevant or
reasonably susceptible of investigation.  These questions involve
factual determination by the jury as to whether the government

24

was unreasonable in its failure to investigate the taxpayer's alleged sources of nontaxable income.")

The Court properly instructed the jury, without objection, regarding these essential elements of the United States' burden of proving this case under the net worth and expenditures method of proof.  See Instruction No. 36 at pp. 49-56 (as instructed, July 26th).  On this particular point, the Court instructed the jury:

> To prove that there is unreported income, the government must either prove that there is a likely source of the unreported income, or negate all possible nontaxable sources of that income of which the government was specifically informed or which it reasonably could have discovered.  When the government bases its case on circumstantial evidence, it has the additional burden of investigating any possible sources offered by the defendant as legitimate explanations of the increase in his net worth.  This depends entirely on the defendant's offer of relevant leads; the government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant.  If you do not conclude that the government has negated a nontaxable source of income of which it was specifically informed or which it reasonably could have discovered, then you must regard that source as nontaxable income in determining whether defendant Matthew Fox had unreported income for the year or years under consideration.

Id. at 51-52.

Thus, the government's obligation to establish the opening net worth by tracking down all reasonable leads or explanations was summarized to the jury as follows:

In determining whether or not the opening net worth is reasonably accurate, you may consider whether the government has tracked down all "reasonable leads" or explanations, if any, suggested to the government by the defendant (or his representative) during the investigation which tend to establish the defendant's innocence.

If you are satisfied that any such reasonable leads and explanations have been exhausted or refuted, then this would be evidence which you could consider in determining whether the opening net worth included all of the defendant's assets. Obviously, improbable explanations would not be entitled to as much weight as plausible and reasonable explanations. If you should find that the government's investigation has failed to refute what seem to you to be plausible explanations, then such failure may be considered by you in determining the validity of the opening net worth.

If you find that the government has not established the opening net worth of the defendant to a reasonable certainty as of the beginning of any year named in the indictment, then you will return a verdict of not guilty as to any such count of the indictment.

If you find as to any year that the funds reflected in increased net worth and expenditures are not substantially in excess of the income reported by the defendant on his return for that year, or if you have a reasonable doubt as to whether such funds are substantially in excess of the reported income, then you will return a verdict of not guilty as to any such count of the indictment.

If you find, on the other hand, that the government has established the opening net worth of the defendant to a reasonable certainty as of the beginning of any year named in the indictment, and if you also are convinced beyond a reasonable doubt that the funds reflected in increased net worth and

> expenditures during such year are
> substantially in excess of the income
> reported on the defendant's tax return, then
> you will proceed to inquire whether the
> government has established that those funds
> represented taxable income on which the
> defendant willfully attempted to evade or
> defeat the tax.

Id. at 53-55.  The Court similarly instructed the jury on taxable

vs. nontaxable sources of income.  Id. at 55-56.  The Court

reminded the jury that the government had to prove either that

"the funds reflected in increased net worth and expenditures

arose from a taxable source or sources or that the funds did not

come from nontaxable sources."  Id. at 56 (emphasis added).

Clearly, the government was not required to both negate all

nontaxable sources and prove that the increased net worth arose

from specific taxable sources, as the Court's instructions made

clear:

> . . . In other words, the government must
> establish either a likely source of income
> from which you believe the net worth increases
> and expenditures sprang, or that nontaxable
> sources of income have been negated as a
> source of the net worth increases and
> expenditures.
>     If you find that the defendant offered
> timely explanations of the source of his
> funds, which were reasonably susceptible of
> being checked, the government may not
> disregard them; and you may take into
> consideration any failure by the government to
> run down such explanations, if any were made,
> or the results of any investigation made by
> the government into the truth of the
> explanations.  On the other hand, if relevant
> leads are not forthcoming, the government is
> not required to negate every conceivable

> source of nontaxable funds, and if the
> defendant failed to supply information in that
> regard, you may take such failure into
> account.  The defendant is not required,
> however, to provide any explanations to prove
> the source of his net worth, for, as I have
> said, the burden is on the government to prove
> beyond a reasonable doubt that the increases
> arose from taxable sources.

<u>Id.</u> at 56.

Applying these legal standards, the Court next addresses the parties' arguments as to the sufficiency of the evidence under Rule 29(c), Fed. R. Crim. P.

**C.   Parties' Arguments**

Defendant Matthew Fox argues that evidence at trial showed the Government failed to investigate reasonable leads his attorney provided of available nontaxable sources that would negate the Government's calculation of his opening net worth. Specifically, there were four categories of money that Defendant claims the Government failed to investigate:

> 1.  $54,000 in insurance proceeds paid out
> between 1987 and 1994, including a bulk
> payment of $34,000 in 1994;
>
> 2.  Social Security payments related to his
> mother's death and totaling approximately
> $40,000, which were allegedly held by his
> father for him until nine months before the
> investigation period;
>
> 3. $34,000 in cash his father gave him as a
> gift in 1997;
>
> 4.  Melody Fox's income after July 2000,
> which she initially failed to report but
> later voluntarily disclosed.

28

The thrust of this argument by Defendant is that the Government failed to perform an adequate investigation necessary to determine what cash on hand he had on January 1, 1998, the beginning of the investigation period, especially in light of information Defendant provided during the investigation that he had received significant money from his family shortly before the period began.

Defendant Fox also argues that the Government provided insufficient evidence to prove that Bare Exposure was the likely source of any unreported income.

The Government concedes that it did not investigate whether Defendant received insurance proceeds totaling $54,000 stemming from his mother's death in 1981 (Tr. July 12 at 127:7-9), but argues that is not relevant because, as IRS Agent Lipski testified, that money was not visible in any of his bank accounts as of January 1, 1998.  In other words, because the insurance payments were from a prior period and the Government adequately established Defendant's opening net worth valuation, there was no obligation to follow that lead and determine whether Defendant received the money.  The Government assumed the money had been paid but that it was spent in the years before the beginning of the investigation period.

The Government provides a similar rationale for the Social Security payments and adds, further, that Defendant never

29

indicated during the investigation that the money had been held
for Defendant until 1997.  The Government argues that Agent
Lipski testified that she assumed it was true that Fox had
received $40,000 in Social Security Survivor's benefits as a
result of his mother's death, beginning in 1981 and ending at the
latest at age 21 in 1990, and therefore did not attempt to obtain
documentation to verify or rebut this claim.  (See Tr. July 12 at
90-91, 136-37.)  Agent Lipski explained however, that she did not
consider the Social Security payments to be a nontaxable source
of funds available to Fox as of January 1, 1998, because it was
her understanding that such payments would have ended years
earlier on his twenty-first birthday, would have been made by
check not cash, and an analysis of his bank account revealed no
significant balance as of January 1, 1998.

As for the money Defendant allegedly received from his
father in 1997, the Government concedes that during the
investigation it was informed of money coming from a family
business but that the details of those payments were so sketchy
that this did not constitute a reasonable lead that they were
obligated to check.  The Government argues that Agent Lipski
noted that Fox's mother had passed away in 1981 and that no
information regarding the nature, name or location of the family
business was provided to her.  The Government argues that in the
absence of any such information about the nature of the business

30

and the inability to interview either of Fox's parents (Fox's father had been institutionalized in 2003 as the result of a brain injury), the assertion by Defendant's attorney that Fox received $34,000 in cash from his parents' business was not a lead reasonably susceptible of being checked.

Further, the Government argues, it had no obligation to follow this lead because when Defendant presented a pile of cash in 2003, worth $20,000, during the investigation intending to show that he had this money still and had not spent it, that nullified the importance of the money for the net worth and expenditures analysis.  That method, which assumes money spent during the prosecution period had an unlawful source, does not account for money, however earned, that is not spend during the period.  Thus, the Government argues, this was not a reasonable lead because the cash displayed was simply unspent cash, more than five years after the beginning of the 1998 tax year. At oral argument on these motions, a dispute arose over what occurred at trial concerning another purported explanation for Defendant's expenditures.  At trial, Matthew Fox testified that he had received $137,000 in cash from his father in 1997.  During the argument of this motion it became unclear whether the testimony by IRS Agent Lipski at trial revealed that she had or had not been informed during her investigation of this transaction.  Defendant argues that she was so informed and that

her failure to investigate it was a failure to investigate a
reasonable lead that dooms the Government's case.  The Government
argues that Agent Lipski was not told about this purported
transaction and that her testimony at trial does not reveal
otherwise.  The Government is correct.  Agent Lipski testified
that her leads related to the claim of a cash hoard came from Mr.
Fox's attorney, Louis Barbone, with whom she met, as reflected in
her memo of 2003.  (Tr. July 12 at 8.)  She recalled Mr. Barbone
telling her that his client had received $34,000 from his
parents' business that he had received over the years and saved
as a child (id. at 18) but there is no evidence that Mr. Barbone
told her that Fox had also received a secret gift of $137,000 in
cash from his father in 1997.  That assertion was first made by
Mr. Fox at trial.  Apparently that "lead" was not given to
Lipski, as the claim was made for the first time at trial in
Matthew Fox's testimony.  The Government cannot be faulted for
failing to follow up on information that it had never received.[1]

---

[1] The United States also presented evidence at trial
negating the existence of such a cash gift.  It's also apparent
that any attempt to follow up on this claim would not have
pointed to evidence confirming this nonreportable source.  The
Government's rebuttal witness, Dorothy Fox, was the widow of
Matthew Fox's father, having lived with him from 1992 until his
institutionalization in 2003.  She testified that he had never
indicated he had any such cash.  She was familiar with his
finances and retirement accounts, and they pooled their earnings
in a joint account.  She testified quite clearly that Matthew
Fox, Sr. never said he gave a large sum to his son, nor to her
knowledge did he do so.  She also confirmed that, due to a brain
injury suffered in 1998, Matthew, Sr. was in declining mental

As for Melody Fox's initially unreported income for 2000, 2001, and 2002, the Government contends that it thoroughly investigated whether Melody was actually working during those years in order to determine whether that income was a potential source of funds available to Matthew Fox that could explain his spending during this period.  The Government notes that Agent Lipski testified that she investigated this lead by reviewing transcripts of Melody Fox's sworn testimony in an unrelated Florida child custody matter in which Melody Fox stated repeatedly that she had not worked at all after August 15, 2000, as well as Matthew Fox's sworn testimony in that matter, in which he stated that Melody Fox had not worked after August 15, 2000 and that he was completely providing for her support. (Tr. July 12 at 84).  Agent Lipski also reviewed Melody Willis' affidavit in the Florida court in 2001 in which she swore to "unemployed" status.   Agent Lipski testified further that she checked IRS databases and found no information provided by employers indicating that Melody Fox had worked during this period. (Id.) Agent Lipski testified that she concluded, based on this evidence and Mr. Ariemma's statement during a July 11, 2003 interview, that he had heard that Melody Fox only worked at Bare Exposures

---

health to the point of requiring institutionalization as a Medicaid patient in 2003, passing away in 2005.  This further confirmed Agent Lipski's testimony of her  understanding when her investigation began in 2003 that the elder Mr. Fox was unavailable to be interviewed.

for a short time, that Melody Fox had not worked during this time
and had not earned the income reported on these belated returns.
(Tr. July 17 at 149-50).  Eventually, Melody Fox was indicted for
conspiracy to evade taxes, and her tax returns, according to the
Government, rather than exonerating her husband, provided
evidence of an unsuccessful attempt to cover up his evasion by
her supplying of a large annual income, previously unreported,
during their relationship.

Ariemma confirmed meeting with Lipski in July 2003, and
providing documents she requested through Ariemma's attorney,
Morris Pinsky, Esq., on several occasions.  Ariemma testified
that he and Matthew Fox hired Melody in July 2000 as a dancer at
Bare Exposure (Tr. July 17 at 176), and she worked there for only
three weeks or a month before stopping.  (Id. at 178-179).  He
testified that Matthew Fox informed him in August 2000 that they
were dating, and that he doesn't want her working as a stripper
anymore.  (Id. at 180.)  Matthew Fox also told Ariemma that he
thought a private investigator could be following them and
detecting that she was dancing, which would hurt her chances in
the Florida custody battle.  (Id. at 181.)  They talked about
this in 2001 when Matt would bring up the subject of the custody
battle, including how it was costing him a lot of money.  (Tr.
July 18 at 100-102.)  Lipski also spoke with Melody Willis Fox's
tax preparer, Maureen Dougherty, who had no documentation of

where Melody was employed in 2000-2002,the years for which Dougherty had assisted in preparing her tax returns.  (Tr. July 17 at 72.)  Dougherty did mention Melody's employment at Bare Exposure at some point between 2000 and 2002 (id. at 73-74), which Lipski regarded as consistent with the Florida testimony of working there briefly before August 15, 2000.

Finally, the Government argues that it provided legally sufficient evidence of a likely source of nontaxable income by negating the Defendant's proffered nontaxable sources of income, particularly his wife's income.  Namely, the investigation revealed that Melody worked only a few weeks at Bare Exposure after she met Matthew Fox, as confirmed by his and her testimony in Florida and Lipski's interview of club owner Ariemma.  She sought and found no W-2's or 1099's for Melody Willis covering the period, and she reasonably determined that her work at Florida strip clubs before July of 2000 was not a source of Matthew's income, since Melody supported her family and was not even acquainted with Matthew before July 2000.

**D.   Analysis**

1.   Reasonable Leads & Opening Net Worth

At the outset, the Court must provide some background for Defendant's arguments that the Government failed to investigate relevant information about non-taxable sources of income received by him prior to 1998.  When the Government undertakes a tax

35

investigation such as this one, the accuracy of a Defendant's opening net worth is critical.  As the Supreme Court explained in Holland, the accuracy of the opening net worth figure is paramount and "the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset."  348 U.S. at 132.  The Government's case cannot go to the jury unless it has provided evidence that establishes the Defendant's opening net worth with reasonable certainty.  Stated another way, in this case, the Government had an obligation to investigate what money and assets were available to Defendant on January 1, 1998.  That obligation included the obligation to investigate information the Defendant gave to the Government relevant to that figure.

For example, the Government was aware of certain bank accounts that had insignificant funds in them at the beginning of 1998.  If the Defendant had alerted the Government that he had ownership of or access to other accounts, the IRS, of course, would have had an obligation to investigate whether that was so. If the Defendant owned assets on January 1, 1998, of which the Government was made aware, it would have had an obligation to investigate those as well, and take the value of those assets into account when establishing or recalculating Defendant's opening net worth.

However, the opening net worth investigation did not require the Government to track the sources of funds in the years before 1998 and to investigate all pre-1998 expenditures in order to rule out these funds as nontaxable sources of opening net worth. Whatever funds Defendant allegedly received prior to 1998 were only relevant to opening net worth if they were still available to Defendant at the beginning of 1998. Although a nontaxable source of income available to the Defendant during the investigation period may include money earned or acquired prior to the investigation, that is so only if the money is available to the Defendant during the tax years at issue, from 1998 to 2002. If Defendant cannot provide any reasonable lead as to where the money, received in prior years, was located on January 1, 1998, there is no information for the Government to investigate. Or, put another away, having established to a reasonable certainty that the money was not in Defendant's possession on January 1, 1998 was the equivalent of investigating the whereabouts of those funds. If the Defendant had provided information about the location of that money on January 1, 1998, the Government would have been obligated to look into that information and re-determine, as accurately as it could in 2003-2004 when the investigation was performed, what Defendant's net worth was on January 1, 1998, the beginning of the first charged year.

Thus, when Defendant alleged he had received some money from family in the past, the Government fulfilled its obligation by investigating Defendant's opening net worth to the degree that one could confidently determine such old funds no longer existed at the beginning of the tax period, or that such funds existed but were not expended during the tax period. Although the term "reasonable lead" often refers to sources of information about nontaxable income received during the charged years, the information Defendant provided about Social Security, insurance, and family sources was relevant only to Defendant's opening net worth, since it all predated 1998. Because the jury could reasonably find that the Government performed an adequate investigation of that opening net worth, it was able to conclude that his finances and his financial behavior were highly inconsistent with someone who had preserved a cash hoard of funds received from his family, Social Security, or insurance in years prior to 1998.

Defendant claimed at trial that money received in the past was held by him on January 1, 1998 as cash in a safe at his home and that his spending from 1998-2002 is explained, in part, by his access to and use of this cash. The Government therefore had an obligation to investigate whether that money was present in the safe on January 1, 1998. The Government investigator testified that she spoke to Defendant's sister who said she had

seen the safe and that it was empty.  Further, the Government
analyzed Defendant's spending and banking habits and determined
that they were inconsistent with the behavior of an individual
who had access to a large cash hoard at the beginning of 1998,
such as borrowing comparatively small sums to finance a boat and
to buy a motor vehicle.  Many other examples were given in the
Government's evidence at trial.

Defendant provided no other reasonable information tending
to show that significant money was in his possession and control
on January 1, 1998.  Thus, regardless of the veracity of his
claims as to what he received either shortly or long before that
date, the Government had no additional obligation to determine
whether that money was received or to document how it was spent,
as Defendant seems to argue, beyond the investigation it actually
performed.  So long as the opening net worth figure was
adequately investigated, and this Court finds that a reasonable
jury could conclude that it was, investigating the receipt of
money and expenditures in prior years was not required before
charging or prosecuting Defendant with tax evasion in this case.[2]

_____

[2]  This Court notes, also, that the Fifth, Seventh and
Eleventh Circuits have held that the IRS has no obligation prior
to prosecution to investigate a defendant's statement that he had
a private cash hoard because such statements by the defendant are
not reasonable leads as they are virtually impossible to
investigate.  See, e.g., United States v. Scrima, 819 F.2d 996,
999 (11th Cir. 1987) ("After everything possible is done to
verify the opening net worth, the issue of the amount of the
defendant's cash hoard is properly submitted to the jury.").

Further, the jury heard all of the evidence regarding the funds Defendant received in the past, how and why he held it until after 1998, and where he kept it. These explanations, even though they were more detailed at trial than the cursory "leads" given in the investigation, did not raise a reasonable doubt with any juror.  Although this jury decision does not negate any obligation on the Government's part to perform a thorough investigation of opening net worth, it shows that the jury, when properly instructed, similarly understood that the cash hoard was not a reasonable explanation for Defendant's spending, given the inability of Defendant to account for its whereabouts prior to the charged years.  Compare Marshall, 557 F.2d at 530-31 ("The issue was essentially one of defendant's credibility and viewed in its entirety, the evidence presented of Marshall's opening net worth in 1969 and his expenditures and receipts during the following two years was sufficient to allow a reasonably minded jury to validly draw the inference that Marshall possessed no cash hoard at the beginning of 1971, the year in question.") Indeed, a significant cash hoard that exists during the charged years but not prior to the opening date only indicates that Defendant is receiving significant sums of money in cash during those charged years, as is essentially alleged by the Government in this case.

---

40

Although, as noted above, Defendant identified several potential sources of nontaxable income that he allegedly received, in the 1980's and early 1990's long prior to January 1, 1998, Agent Lipski assumed that information was not relevant because she had already determined that as of January 1, 1998, the money was spent and Defendant's net worth was relatively low. If Defendant had provided any evidence tending to show that large amounts of money were still available to him on January 1, 1998, the Government would have had an additional obligation to investigate that evidence.  By carefully examining the financial habits and documented expenditures around the 1998 period, the Government could reasonably conclude that there was no corroboration of the supposed cash hoard, and indeed that the Defendant's own behavior pointed at the absence of such a hoard. Without being supplied with a confirmable source for the cash (the elder Mr. Fox being unavailable) or an amount, or the claimed location of the cash, the IRS could hardly do more to follow the lead it was given.

In this case, IRS Agent Lipski calculated Defendant's opening net worth from two principal sources: (1) Defendant's bank statement in January 1998 and (2) Defendant's statement on a credit application in April 1998.  In addition, the Government used its observations of Defendant's spending and banking habits, including his apparent need to borrow money for a boat and a

vehicle, to determine that no significant amount of cash was in his possession.

Defendant argues that he understated his net worth on the credit application because he assumed the application was asking how much money he had brought with him to the store.  Although he was entitled to make that argument to the jury, and he did, the Government was not unreasonable to use this information, along with other evidence, to establish Defendant's opening net worth. In fact, an individual with an interest in securing financing or credit has an incentive to overstate, rather than understate, his financial worth on a credit application, so as to appear more creditworthy.  There's certainly no reason to believe he would have been denied credit if he indicated he had cash assets in six figures.

Thus, the Court finds that there is substantial evidence the Government followed all reasonable leads provided to it in determining, to a reasonable certainty, Mr. Fox's net worth as of January 1, 1998.  Viewing the evidence in favor of the prosecution, a reasonable jury could have found that he had limited cash available to him at that time.

    2.   Reasonable Leads and Melody Fox's Income

Mr. Fox also makes a more standard argument about so-called "reasonable leads" -- that his wife, Melody Fox, was earning income during some of the years for which he is charged with

failing to report his income, that her income explains his spending beginning when she moved from Florida to New Jersey in mid-2000, and that when he informed the Government of her income, it failed to adequately investigate her employment.  Of course, Melody's income could be a source of nontaxable income to Mr. Fox, as Special Agent Lipski concedes, if it were true.  If Melody was earning money that Matthew was spending, her earnings could explain some of his expenditures.

First, the Court notes that undisputed evidence at trial established that Matthew and Melody Fox met in the summer of 2000 and began sharing resources soon thereafter.  They were married in February of 2003.  Thus, even under Mr. Fox's version of facts, Melody's income could not explain any of his expenditures for the early years for which he is charged with evading income taxes, 1998 and 1999, nor January through July of 2000.[3]

------

[3] Further, evidence clearly showed Matthew Fox willfully omitted claiming any income from Bare Exposure in 1998, when in fact he was earning $400 weekly plus tips.  He claimed a small amount of income but no tips in 1999 and 2000, when the evidence was to the contrary, according to the testimony of Bare Exposure owner Anthony Ariemma, who testified that Fox's share of tips was $100-$120 on a Saturday shift, $60-$70 on a Friday night, and $20-$30 on other nights.  (Tr. July 17 at 163-165.)  Assuming Matthew Fox worked Fridays, Saturdays, and one or two other nights, his tip income was more than $200 per week, or more than $10,000 per year, all unreported taxable income.  This is, of course, sufficient evidence of tax evasion for the years 1998, 1999, and 2000 based upon failure to declare any wages for 1998 and any tips for 1998-2000.

As for the later years, the Government argues that it adequately investigated whether Melody Fox was working during those years and determined that she was not working after August 2000, when they began living together.  The Government's investigation consisted of two categories of evidence: evidence from the Defendants themselves and evidence from Bare Exposure, purportedly Melody's employer during those years.

On three occasions in 2001 and 2002, Matthew and Melody Fox testified under oath, in a child custody dispute in Florida, that Melody was no longer working, and thus, no longer earning income, after only a brief employment at Bare Exposure after moving to New Jersey in July 2000.  That testimony was provided to Agent Lipski during her investigation of the Foxes by the attorney for Mrs. Fox's ex-husband, with whom Melody had a custody dispute. (July 17 Tr. at 72.)  That testimony also indicated that Melody Fox earned money throughout 2000, prior to August, from named clubs in Florida, from Bare Exposure, and from a photo shoot in France.  (Id. at 76-78.)  Agent Lipski investigated these sources of income by checking the IRS databases to determine whether 1099's or W-2's were issued to Mrs. Fox, then named Melody Willis, and to ask Mr. Ariemma, in her July 11, 2003 meeting with him and his attorney, whether Melody worked at Bare Exposure, his club.  Mr. Ariemma told Agent Lipski that he heard Melody worked at his club for a short period of time but he didn't know when.

44

(Tr. July 17 92:13-15, 142:7-9.)  Lipski asked Ariemma for records of dancers, and he said the club had no records.  (Tr. July 17 at 145).  If Lipski had made a more pointed inquiry of Ariemma about Melody Fox, he presumably would have told her what he told the jury at trial, namely, that he hired her in July 2000 and she worked for only three weeks or a month before stopping when she began dating Matthew Fox, and never resuming, being wary of the custody battle.  (Tr. July 17 at 176, 179-181.)  In any event, from what Agent Lipski learned from the Florida testimony of Matthew Fox and Melody Willis and from the lack of corroboration of her sustained employment at Bare Exposure and the absence of any lead identifying some other source of her income, the IRS could reasonably conclude that further investigation was not necessary.

At trial, Mr. Ariemma testified that he kept Bare Exposure's door sheets, which included the records of which dancers and managers were working on a given night and how much money was coming in for admission, as well as some indication of the number of dances performed, in a box at his home from 2002 up until 2005, when the club began a computer system.  (Tr. July 18 at 28-29, 35-36, 38, 54.)  He did not make the IRS aware of these door sheets, but in any event, they would have been unavailable because Ariemma never saw Melody Fox dancing after the brief period in 2000.

45

On July 11, 2003, Agent Lipski met with Anthony Ariemma, an owner of Bare Exposure, and his attorney, to discuss Matthew Fox's work history there.  (Tr. July 17 at 27-29.)  She obtained no employment records from Mr. Ariemma, related either to Mr. or Mrs. Fox.  (Id. at 30.)  Mr. Ariemma stated Bare Exposure did not issue a W-2 or a 1099 for the period of time that Melody Fox worked there.

During the course of the investigation, on July 30, 2003, Melody Fox belatedly filed tax returns for the years 2000, 2001 and 2002, which indicated that she earned substantial income. Mr. Barbone presented these tax returns to Agent Lipski as an explanation of his spending for those years.  After receiving these forms, Agent Lipksi asked Ms. Dougherty to identify the "various locations" vaguely mentioned as places of employment on these returns and, as Agent Lipski testified, she received no response identifying any workplace.

At trial, Ariemma testified that Melody Fox was not working at the club in 2001, but that he listed her as an employee on his health insurance plan for employees as a favor to Matthew, who was the manager at that time.  (Tr. July 17 at 167.)  Ariemma testified that Melody was hired to work at the club in July of 2000 (id. at 175) and that she worked there for three weeks to a month (Id. at 179-80).  Another manager, a former close friend of Mr. Fox, Aldo Esposito, also testified that Melody was not

46

working at Bare Exposure in 2001 and 2002, and that she had worked only a month or month-and-a-half at the beginning, in 2000.  (Tr. July 18 at 18, 23.)

Most significantly, Aldo Esposito also testified that Matthew Fox approached him in the fall of 2006 to sign two forged documents (Exs. 42.1 and 42.2) to try to establish that Melody was working at Bare Exposure in 2001 and 2002 when she was not. (Tr. July 19 at 19-23.)  He signed these back-dated documents at Matthew Fox's request to manufacture subcontractor forms bearing Melody's name for a period of time when he worked as an assistant manager but she was no longer a dancer.  (Id.)

There was contradictory testimony at trial from patrons -- including Matthew's friends -- and the defendants, that indicated Melody was working at Bare Exposure after August of 2000.  No corroborating employer or patron was identified to the IRS at any point in the investigation, and the IRS's duty of a reasonable investigation of leads does not include guessing where a taxpayer might be working.  While the Government did not know of the existence of any "door sheets" during 2003 and 2004, and therefore did not seek them, one can only speculate what those sheets contained.  A single specimen of unknown origin was shown to Mr. Esposito at trial (Ex. D-15), but it was unauthenticated as a business record under Rule 803(6), Fed. R. Ev., and not admitted into evidence, although Esposito's past recollection

47

recorded was admissible under Rule 803(5), that he signed a sheet as a manager in 2002 indicating that among the dancers that day was a "Melanie", which was a name Melody Willis had used when dancing.  It was up to the jury to decide on the weight to be given to this stray "door sheet" as well as the IRS's failure to learn the existence of door sheets before they were destroyed in 2005.

Nevertheless, there was ample evidence at trial from which a jury could believe, beyond a reasonable doubt, that Melody Fox ceased working at Bare Exposure in August of 2000.  Furthermore, evidence that the defendants passed off her income from early 2000 as a source available to him, even though they had not met at the time, was evidence of consciousness of guilt from which the jury could infer that Mrs. Fox's tax returns were not proof of a source of income funding Matthew Fox's expenditures from August 2000 through December 2002.

3.   Likely Source

As stated above, the Government has an additional obligation either to prove there was a likely source of taxable income that Defendant did not report or to disprove all possible sources of nontaxable income.  The Government chose the second method -- disproving the possible sources of nontaxable income for which it had reasonable leads -- and the government did not argue or attempt to show a likely source of taxable income.

48

The parties agree that there are two permissible approaches to circumstantially proving unreported income: the Government must either negate all possible non-taxable sources of income or show a likely source of unreported income.  See United States v. Goichman, supra, 547 F.2d at 781; see also Spear v. Commissioner (Estate of Spear), 41 F.3d 103, 108 (3d Cir. 1994) ("In a net worth case, the Commissioner must: (1) establish with reasonable certainty an opening net worth; and (2) either (a) show a likely income source, or (b) negate possible nontaxable income sources.").  Of course, this methodology does not change the burden of proof, so that if the Government attempts to disprove all possible sources of nontaxable income, it must do so by proof beyond a reasonable doubt.

If the Government chooses not to prove likely source but to negate the possible nontaxable sources of the alleged net worth, there is no further obligation to prove a likely source of taxable income.  United States v. Goichman, 547 F.2d at 781; see United States v. Chu, 779 F.2d 356, 366 (7th Cir. 1985) ("the government investigated all 'relevant leads ... reasonably susceptible of being checked,' thus negating possible sources of non-taxable income.").

For the reasons discussed above, the Government produced evidence of the leads it received and its investigation and surrounding circumstances from which the jury could reasonably

49

find, beyond a reasonable doubt, that it negated all nontaxable sources of income of which it was made aware.  The jury was free to find that the leads given to the IRS were vague or irrelevant, government's investigation was reasonably performed, that its conclusions about the non-existence of a pre-1998 cash hoard and Melody Fox's earnings after July 2000 were logical, and that Matthew Fox neither expended funds from a pre-existing secret cash hoard nor did he receive money from earnings of Melody Fox as claimed.  While Defendant Fox can, and does, suggest measures that the government, in hindsight, might have employed in proving these negatives, such as examining door sheets for Bare Exposure that the IRS did not know to exist, the law does not require the government, in a net worth and expenditures case, to eliminate every conceivable possibility of nontaxable sources.  The jury also heard evidence undermining Matthew Fox's credibility, such as his attempt to use Aldo Esposito to manufacture evidence and his profession of ignorance of the fact that savings accounts earn interest, among other statements, which tended to erode his overall credibility.  The jury evaluated all the relevant circumstances and applied a correct statement of the law in determining the government met its burden beyond a reasonable doubt.

The jury's verdicts on Counts Two through Six are amply supported by evidence, and the motion for acquittal under Rule 29(c) will be denied.

**E.   Motion for New Trial under Fed. R. Crim. P. 33(a)**

Defendant Matthew Fox urges the Court to set aside the verdicts and order a new trial under Rule 33(a) based upon an alleged "confluence of multiple errors and prejudicial events at trial." Def. Br. at 40.  Four such situations are mentioned, namely:  (1) the acquittal of both Defendants on the conspiracy count is inconsistent with convicting Matthew Fox on Counts Four, Five, and Six; (2) a remark in the prosecutor's opening statement about the possibility of Melody Fox's ex-husband hiring a private investigator to see if she was still dancing; (3) questions asked by the Court of prosecution witness Maureen Dougherty; and (4) the prosecutor's exclamation in front of the jury that Melody Fox's attorney, who possessed the prosecutor's documents that the prosecutor had not given to him, must have "taken" the documents from the prosecutor's table.  These are addressed in order.

1.   Inconsistency of Verdicts

Defendant points at the alleged inconsistency of the jury's verdicts, in which Matthew and Melody Fox were acquitted of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 in Count 1, while Matthew Fox was convicted of evasion of income taxes for 1998-2002 in violation of 26 U.S.C. § 7201 in

Counts 2-6.  Defendant argues that there is no rational explanation for the jury to find Melody not guilty of a conspiracy if the central predicate of the government's theory was accepted.  (Def. Br. at 40.)  Defendant invokes the "rule of consistency" and cites to Government of the Virgin Islands v. Hoheb, 777 F.2d 138, 141 (3d Cir. 1985).  The "rule of consistency" is inapplicable here, because neither defendant was convicted of conspiracy.  It applies only when one defendant is convicted of conspiracy where the remaining defendants are acquitted of conspiracy.  Id. at 140-41.  Even in Hoheb, the Third Circuit noted the narrow application, and observed that a conviction for conspiracy will still stand if the government proves that the defendant conspired with an unknown person.  Id. The Third Circuit also noted that the "rule of consistency" might be a "vestige of the past."  Id. at 142 n.6.

The present case presents the far more common situation where a jury convicts on some criminal charges and acquits on another where the crimes arose from largely the same facts and circumstances but the elements of proof are different, as they assuredly are between tax evasion under 26 U.S.C. § 7201 and conspiracy to defraud the United States under 18 U.S.C. § 371. Moreover, the acquittal on conspiracy pertained, at most, to the years 2000-2002, and had nothing to do with the tax evasion in 1998 and 1999.

Even if there were an inconsistency, it is by now well-established that in a criminal case "jury verdicts cannot be set aside solely on the ground of inconsistency." United States v. Vastola, 989 F.2d 1318, 1329 (3d Cir. 1993), citing United States v. Powell, 469 U.S. 57, 67 (1984); City of Los Angeles v. Heller, 475 U.S. 796, 805-06 (1986) (J. Stevens, dissenting) (observing the "clear" rule that "[i]n a criminal case, a jury's apparently inconsistent verdict is allowed to stand").

The Court of Appeals in United States v. Uzzolino, 651 F.2d 207 (3d Cir. 1981), reversed the district court's order setting aside an allegedly inconsistent jury verdict and reinstated the conspiracy conviction where the defendant was acquitted of the substantive offense.  The Third Circuit summarized the law in this area:

> First, we note, as did the trial court, that even if a jury's verdicts are inconsistent, inconsistency alone is not an appropriate legal basis to reverse an otherwise valid jury verdict. See Hamling v. United States, 418 U.S. 87, 101, 94 S. Ct. 2887, 2899, 41 L. Ed.2d 590 (1973); United States v. Continental Group, Inc., 603 F.2d 444, 455 (3d Cir. 1979), cert. denied, 444 U.S. 1032, 100 S. Ct. 703, 62 L.Ed.2d 668 (1980). The general rule is that inconsistent verdicts will be left to stand as a hallmark to the jury's "assumption of a power which they had no right to exercise, but to which they were disposed through lenity." Dunn v. United States, 284 U.S. 390, 393 [1932], quoting Steckler v. United States, 7 F.2d 59, 60 (2d Cir. 1925).[FN10] Only in a rare case will such verdicts demonstrate that there was no legal basis for the jury's decisions. See, e.g.,

> United States v. Hannah, 584 F.2d 27 (3d Cir.
> 1978).[FN11] Certainly, where, as in this
> case, there is some question as to whether the
> verdicts are inconsistent, the jury's verdicts
> will not be disturbed. See United States v.
> Varkonyi, 611 F.2d 84, 86 (5th Cir.), cert.
> denied, 446 U.S. 945, 100 S. Ct. 2173, 64
> L.Ed.2d 801 (1980).

Uzzolino, 651 F. 2d at 213.  The one instance referenced by the

Uzzolino opinion where a verdict was set aside due to

inconsistency was the Hannah case, in which "the conspiracy for

which the defendant had been acquitted was a predicate offense to

the substantive offense of using the mails to facilitate that

same conspiracy," so that the facilitation conviction was

insufficient as a matter of law.  Uzzolino, 651 F.2d at 213 n.11.

Since both Hanna and Uzzolino, the Supreme Court has reaffirmed

the principle that a verdict cannot be set aside solely based on

inconsistency, so long as the conviction is supported by

sufficient evidence.  United States v. Powell, 469 U.S. 57, 67

(1984).

Thus, the perceived inconsistency of verdicts in the present

case is not the basis for a new trial on any of the counts of

conviction.  If defendant is searching for a rational explanation

of how Matthew Fox could be found guilty of the tax evasion

counts and not guilty, with Melody Fox, of the conspiracy count,

defendant might look no further than the jury's exercise of its

power of lenity in not convicting the Foxes of conspiracy, as

recognized above, in Dunn v. United States, 284 U.S. 390, 393

(1932), quoting <u>Steckler v. United States</u>, 7 F.2d 59, 60 (2d Cir. 1925).  In any event, counsel for Melody Fox, in closing arguments, principally invited the jury to find there was not sufficient evidence that Melody Fox knowingly agreed to defraud the government of money, a question he posed to the jury in different ways in his closings.  The jury may have taken up counsel's suggestion and found reasonable doubt as to the existence of the agreement between Matthew and Melody Fox that was necessary to convict on Count 1 but not necessary for Counts 2-6.

In summary, the Court finds no grounds arising from any inconsistency of verdicts to set aside the convictions under Rule 33(a), Fed. R. Crim. P.

2. <u>Prosecutor's Remark about Private Investigation</u>

Defendant Fox objected to a portion of the prosecutor's opening statement in which he pondered whether it would have been difficult for the ex-husband of Melody Fox to hire an investigator to see if in fact she was still dancing, as part of the custody battle.  The prosecutor's statement was intended to preview evidence that the government would introduce at trial regarding Defendants' concern that if Melody Fox were to continue dancing, it could be easily detected by a private investigator for use against her in the custody case.

The government indeed introduced such evidence at trial.  As noted above, Anthony Ariemma testified that Matthew Fox told him about the custody battle and that he was concerned a private investigator could be following them to see if Melody was dancing.  (Tr. July 17 at 180-181; see also Tr. July 18 at 100-102).  Although Ariemma explained that Fox's custody battle began after Melody Willis Fox quit dancing, "he [Matt] thinks like PI's are following them."  (Tr. July 17 at 181.)

The prosecutor's remarks in opening, intended to preview trial testimony, were indeed linked to the testimony that was presented and those remarks are not objectionable.  The jury, as always, was instructed many times that counsel's opening statement and arguments are not evidence.  There was no prejudice to Matthew Fox in these remarks, which were not inflammatory nor wide of the mark from evidence later introduced at trial.  The prosecutor's remarks raise no concern to be further addressed under Rule 33(a).

### 3.    Questions by the Court

Defendant alleges that several questions asked by the Court of witness Maureen Dougherty, who prepared the Melody Fox tax returns in 2003, were prejudicial to Matthew Fox.  Ms. Dougherty was called by the government in its direct case.  She is an attorney with a civil tax practice.  (Tr. July 11 at 4-5.)  She testified that Matthew Fox first consulted her about his own tax

56

problems in the Spring of 2003, and she referred him to a criminal attorney.  (Id. at 5-7.)  Matthew Fox next consulted her in June or July of 2003 with concerns for his wife Melody's tax situation, so she made an appointment and saw both Foxes on June 11, 2003.  (Id. at 8.)  They told Dougherty that Melody had earned income as an exotic dancer in prior years but had filed no tax returns.  (Id. at 9-10.)  She met with them several times and attempted to reconstruct Melody's income for 2000-2002.  (Id. at 11-13.)  She filed the returns with IRS under a voluntary disclosure program on July 30, 2003.  (Id. at 30-31.)

Upon cross-examination, testimony revealed that Ms. Dougherty was a tax expert with a Masters in Taxation from NYU Law School, who also taught law school courses in Florida, including two semesters of civil procedure, conflicts of law, and property in 2004-05.  (Id. at 57.)  Ms. Dougherty testified to her intention or plan to "give [Melody] the best chance at having these returns respected and not being dragged into something in term of her spouse's issues with the IRS.  My only focus was on my client and my client was solely Melody."  (Id. at 71.)  Over the government's hearsay objection, defense counsel examined Dougherty about Melody's concerns about how her exotic dancing had affected her child custody of her daughter.  (Id. at 74.)  Dougherty added that Melody said she had lied in depositions or to the judge about her dancing.  (Id. at 74-75.)  Dougherty

revealed that she advised her client to "file the returns and deal with the custody issue," and predicted that if her ex-husband would seek to reopen the custody issue after these returns are filed, she told Melody that "you have a decent shot at defending any attempt on his part to obtain custody of the minor child." (Id. at 74-75.)  Finally, on this topic, Ms. Dougherty again indicated, in response to defense counsel's questions, that Melody Fox "was very upset about the investigation.  She was very concerned about my advice to her to go and file...  That's why she was stressed, she was pregnant, she was upset about the investigation, and she was upset about the potential impact on custody."  (Id. at 90.)

    Because the testimony about Ms. Dougherty's advice to Ms. Fox needed clarification, the Court determined, at the end of all questioning, to ask a follow-up question under Rule 614(b), Fed. R. Ev.,[4] which included the following:

> THE COURT:  Okay.  And you mentioned in your testimony that Melody Fox had lied during the course of her Florida court testimony.  Do you recall that?
>
> THE WITNESS:  I do recall that.
>
> THE COURT:  And did you know that at the time when you were advising Melody Fox about filing correct tax returns?

---

[4] Rule 614(b) states:  "Interrogation by court.  The court may interrogate witnesses, whether called by itself or by a party."

58

> THE WITNESS:  I can't say that I knew.  I can
>     say what she represented to me, yes, I
>     did, and I went through that issue with
>     her in private, just Melody and I.
>
> THE COURT:  Did you advise her then to correct
>     her false testimony in the Florida court?
>
> THE WITNESS:  The case was closed, the divorce
>     was complete, the custody issue was over,
>     and I felt -- and she was no longer
>     dancing and I didn't, frankly, think that
>     I had a responsibility to do that.  I'm
>     not sure --
>
> THE COURT:  So you did not?
>
> THE WITNESS:  I did not.  Had I thought I had
>     a responsibility to do so, I would have.

(Tr. July 11 at 102:5-22.)

Counsel voiced no objection, and each attorney had the opportunity to ask follow-up questions.  (Id. at 103-104.)  Two more witnesses testified that day -- Lloyd Jones and Violet Meyer.  The next day, July 12, Mr. Poplar first raised an objection, arguing that the jury might infer from the Court's question, that Ms. Dougherty had a duty to advise Ms. Fox to correct the misstatements in the Florida court; Mr. Poplar opined it would be inappropriate for a lawyer to advise a client to return to court to correct materially false statements.  He requested that the Court five the jury an advisory instruction that they should not presume, from the question on the witness's answer, that there was any duty to so advise the client.  After reviewing the transcript, and discussing the clarifying

instruction with counsel, the Court gave a curative instruction on the next trial day, July 17, clarifying that the Court, in its questioning of Ms. Dougherty, did not mean to imply that Ms. Dougherty had an ethical obligation to advise Ms. Fox to take corrective action about her false testimony in Florida.[5]

The Court's questioning of Maureen Dougherty was not improper under Rule 614(b). She was a government witness, the subject of advice she gave to Melody Fox about the possibility of a reopened custody hearing in Florida was elicited by defense counsel, and the question about whether she advised Ms. Fox to voluntarily come forward to the Florida court and admit she gave

---

[5] The clarifying instruction stated to the jury:

> . . . I wanted to give you one clarifying instruction for your information in this case. The clarifying instruction concerns . . . a question that I had asked of the witness Maureen Dougherty last week on Wednesday. Last Wednesday I asked the witness Maureen Dougherty if she had advised her client to contact the Florida authorities regarding Melody Willis Fox's untrue statements in the Florida legal proceedings. By that question, ladies and gentlemen, I did not mean to infer that Ms. Dougherty had a duty to advise her client to contact the Florida authorities. To the contrary, under the facts of the case, Maureen Dougherty had no ethical duty or obligation to advise her client to contact the Florida authorities about Ms. Fox's untrue statements and you may consider Ms. Dougherty's answers in this light. And that's my clarifying instruction.

Tr. July 17, 2007 at 4-5.

false testimony was a relevant question.  The Court did not dwell on this issue or act confrontational toward this witness, nor did the Court express any skepticism about the witness's answers. The witness seemed to accept Ms. Fox's version that her Florida statements were false, and the question was an exploration of whether Dougherty, as an experienced New Jersey attorney and Florida law professor, considered and discussed the jeopardy Fox might place herself into by subscribing tax returns under oath that so directly contradicted her Florida testimony, also under oath.  The questions were probative because the more Dougherty recalled Melody Fox's statements to her that her Florida testimony was false, the more likely it may be that Defendant's explanation at trial regarding the falsity was consistent with her statements to Dougherty four years earlier.  The answer given -- that she gave Melody Fox no such advice and that she had no duty to do so -- aided Defendants, especially Melody Fox, who could not be accused of failing to follow her attorney's advice to file her returns first and not worry about the implications for child custody in Florida.

Moreover, the Court acquiesced in defense counsel's request for a clarifying instruction and gave it, after reviewing it with all counsel, so that no juror could misinterpret the question as implying criticism of Dougherty for breaching some ethical duty.

Trial judges have discretion to ask questions of witnesses, to a greater extent in a complex case (such as this one) than in a simpler case, United States v. Green, 544 F.2d 138 (3d Cir. 1976).  A judge must understandably be cautious in questioning a defendant in a criminal case, but direct, specific questions to clarify a defendant's testimony will not give rise to error where the judge's impartiality remains intact.  United States v. Gonzalez-Torres, 980 F.2d 788 (1st Cir. 1992).  For example, judicial questions that telegraph to the jury that the judge disbelieves the defendant can result in reversal of a conviction, United States v. Tilghman, 134 F.3d 414 (D.C. Cir. 1998).  No such questioning occurred here.  Similarly, if a trial judge continually interrupts the examination of a witness, posing numerous questions in succession and talking over the examination, the discretion of Rule 614(b) is exceeded, although even in such a case, a new trial may not be necessary.  United States v. Wilensky, 757 F.2d 594 (3d Cir. 1985).  Again, no such questioning occurred here, as the few questions asked of the witness came at the end of all questioning and involved an effort to clarify the nature of her advice to her client.  "Overzealous" cross-examination by a judge of the defendant's alibi witnesses, in a manner conveying skepticism about the defendant's alibi, could likewise cross the line, as in United States v. Beaty, 722 F.2d 1090 (3d Cir. 1983), but nothing of the sort occurred here.

The Court's questions at issue here trigger none of these concerns.  Any implication of possible unethical behavior by the witness was eliminated by the clarifying instruction to the jury.  Finally, the jury was instructed, before the questioning of Ms. Dougherty (Tr. July 11 at 99:27-14), that the judge is permitted to ask clarifying questions and that the fact a judge asks a question or two does not invest the question or answer with any more or less significance than any other question that's answered.

The questioning to which defense counsel now objects was well within the bounds of Rule 614(b) and of the defendant's fair trial rights and does not give rise to a concern under Rule 33(a).

### 4.   Comment of Prosecutor toward Mr. Poplar

Lastly, Defendant Matthew Fox argues that a comment made by government counsel, Andrew Kameros, to Melody Fox's counsel, Carl Poplar, when Mr. Poplar attempted to examine a witness with a document Mr. Poplar had inadvertently take from the prosecutor's table, caused prejudice to Matthew Fox that was not cured by the Court's curative instruction to the jury.  This episode requires little comment.

Briefly, this mini-drama unfolded as Mr. Poplar attempted to cross-examine Mr. Ariemma, one of the owners of Bare Exposure, about a series of Ariemma's corporate tax returns for 2000

through 2003, Exs. D-20, D-21, D-23, and D-24, respectively, which had been furnished to Poplar by the government as a result of a subpoena for those years.  (Tr. July 18 at 155-158.)  When Mr. Poplar then proceeded to use a 2004 corporate return (Ex. D-25) that was not within the subpoena and had not be produced to Mr. Poplar by Mr. Kameros, the government objected and the following ensued:

> KAMEROS:  Objection.  Your Honor, the subpoena was for 2001 through 2003, the 2004 return was not called for.
>
> THE COURT:  I think that's correct.
>
> MR. POPLAR:   I had this in my file, your Honor.
>
> KAMEROS:  I don't know where they got it from, they didn't get it from us.
>
> MR. POPLAR:  In any event --
>
> THE COURT:  It seems to be beyond the scope of --
>
> MR. POPLAR:  But it's --
>
> THE COURT:  -- of the issues in this case if it's 2004.
>
> MR. POPLAR:  No, but he said that it's 50/50 up through the present time.  And 2004, you know, shows that the accountant's faux pas perpetuated itself, meaning it wasn't an accountant faux pas.
>
> THE COURT:  So this next return, D-25, is a 2004?
>
> MR. POPLAR:  Right.
>
> THE COURT:  And the objection is?

64

MR. KAMEROS:  Objection.  Those were not among
    the copies that we turned over.

MR.  POPLAR:    That  was  in  the  stack  of
    documents I reviewed last night.

MR. KAMEROS:  The order was for 1998 through
    2002.

THE COURT:  If that's the objection, can you
    ask the witness if that was one of the
    documents turned over?

BY MR. POPLAR:
Q.   Is this one of the documents you turned
    over to the courthouse last week?

A.   I gave the '04 to them.

MR.  KAMEROS:    That  was  not  turned  over  to
    them.

MR. POPLAR:  It sure was.  I wouldn't have had
    it.

MR. KAMEROS:  You took it.  It was not turned
    over.

MR. POPLAR:  Judge, can I ask for some kind of
    admonition to the prosecutor?

MR. KAMEROS:  We need to go to sidebar.

MR.  POPLAR:   Judge, I would like to have an
    instruction right now that admonishes the
    prosecutor.

THE  COURT:   I'm going to sort this out at
    sidebar.     There  was,  ladies  and
    gentlemen, a subpoena that required this
    witness to produce certain tax documents
    through the year 2003 and he did so.
    Apparently  his  testimony  is  that  he
    produced beyond what was required in the
    subpoena and that Mr. Poplar received a
    copy,  I'm  sorry,  that  Mr.  Kameros
    received these documents from the witness

> and so we'll see what comes next.  Just a
> moment.

(Tr. July 18 at 159-160.)  The jury was excused and the Court,
with counsel, sorted out what had happened and addressed Mr.
Poplar's request for an instruction admonishing Mr. Kameros for
accusing him of taking the document.  It emerged that the
questioned document came into Mr. Poplar's possession when he
indeed did take it, by inadvertence, from the prosecutor's table
which he had used as a platform in questioning other witnesses.
(Id. at 165-166.)  The Court found that "Mr. Poplar did
inadvertently take the documents to which he wasn't entitled."
(Id. at 165:25-166:1.)  Mr. Poplar eventually agreed with these
facts, stating:  "There's no question about it, your Honor.
There's no question about it, as I'm reconstructing it now, you
know, what transpired is Mr. Kameros or the government left these
papers clearly on this side of the table and I walked away with
them.  And last night when I was going through them, if I was
focused on that subpoena, I would have had a better recollection
that they weren't mine, but I didn't."  (Id. at 173:21-174:2.)

While the Court declined to admonish Mr. Kameros for his
choice of words in front of the jury, the Court did craft a
detailed instruction which it reviewed and improved with input
from all counsel.  (Id. at 174:13-179:22.)  The jury was
immediately returned to the courtroom and, before any further
testimony was taken, the Court correctly instructed them that Mr.

66

Poplar inadvertently obtained these tax documents from the table behind the prosecutors when Mr. Poplar used that table for his own records, and that the matter of production of documents is a procedural matter and not for the jury, and finally, to disregard Mr. Kameros' statement and give the matter no further thought. (Id. at 180:1-24.)[6]  No juror could have been left with the

---

[6] The entire instruction on this point follows:

Ladies and gentlemen, before we proceed, let me give you the following instruction:

There was an exchange of words between counsel before the break in which Mr. Kameros was surprised to learn that Mr. Poplar was using a tax document that had not been produced to Mr. Poplar in this case.  Mr. Kameros indicated that he thought Mr. Poplar took the extra documents, which Mr. Poplar denied.  Now, the production of documents concerns a procedural matter and it is a matter for the Court and not for the jury. Counsel have been instructed to raise such matters with the Court only at sidebar and this exchange between counsel should not have occurred.  But because this occurred in your presence, I sorted out this matter and I concluded that Mr. Poplar inadvertently obtained these tax documents from the table behind the prosecutors when Mr. Poplar used that table from his own records in cross-examining a witness yesterday.  Mr. Kameros did not produce these records to Mr. Poplar nor was he required to produce these records. But because the documents came into Mr. Poplar's possession unintentionally and inadvertently, I will hereby instruct you to disregard Mr. Kameros' statement and to give the matter no further thought.

Does everyone understand my instruction? Does anyone need to have it repeated?  Very well.

(Tr. July 18 at 180:1-24.)

impression that Mr. Poplar purloined the documents, and all jurors were told that counsel's objection should have been addressed to the Court at sidebar, rather than the colloquy that took place before the jury for a moment until they were excused.

How any of this could even arguably prejudice Matthew Fox is unclear.  Mr. Poplar represented Melody Fox who was acquitted. Mr. Barbone was never implicated in Mr. Poplar's mistaken taking of the documents.

The next day, Mr. Poplar raised the subject again, this time accusing Mr. Kameros of making an accusation of purloining that was a "volitional and non-inadvertent" comment.  (Tr. July 19 at 6:14-19.)  Mr. Poplar then moved for a mistrial and the Court denied the motion, recapitulating the events and the Court's reasoning in a detailed oral opinion.  (Id. at 7:21 to 10:17.)

In summary, nothing about this brief exchange in front of the jury, and its prompt resolution and explanation in a curative instruction to the jury, causes concern about the overall fairness of the trial or prejudice to Matthew Fox's fair trial right.

## IV.  CONCLUSION

For the reasons discussed above, the motions for judgment and for a new trial are denied.  The appropriate Order has been entered.

**October 21, 2009**       **s/ Jerome B. Simandle**
Date            JEROME B. SIMANDLE
                      U.S. District Judge